IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| RICHARD LEHAN ET AL., | * |
| Plaintiffs, | * |
|  | * |
| v. | * |
|  | *     Civil No. 21-0362-BAH |
| DEPUTY SHERIFF RICHARD WILSON ET AL., | * |
|  | * |
| Defendants. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiffs Richard Lehan ("Mr. Lehan") and Tamara Lehan ("Ms. Lehan") sued Deputy Sheriff Richard Wilson ("Wilson") and A&A Gaming, LLC ("A&A") (collectively, "Defendants") alleging federal and state constitutional violations as well as state tort claims.[1] ECF 1. The complaint stems from the arrest of both Lehans by Wilson on the night of March 23, 2019 at Abner's Crabhouse ("Abner's") in Chesapeake Beach, Maryland, which is owned and operated by A&A. *Id.* at 3–4. Pending before the Court is Defendant Wilson's motion for partial summary judgment. ECF 55. Plaintiffs filed an opposition, ECF 63, and Defendant Wilson filed a reply, ECF 70. Defendant A&A has also filed a motion for summary judgment. ECF 80. Plaintiffs have opposed A&A's motion, ECF 84, and A&A has replied, ECF 94. All filings include memoranda

---

[1] Plaintiffs also originally brought suit against the State of Maryland and the Calvert County Board of County Commissioners. *See* ECF 1. The State of Maryland was dismissed as a defendant on March 8, 2022, *see* ECF 26, while all claims against the Calvert County Board of County Commissioners were dismissed on January 11, 2023, *see* ECF 38.

of law, and all but Defendants' replies include exhibits.[2] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Defendant Wilson's motion is GRANTED in part and DENIED in part and Defendant A&A's motion is DENIED.

## I.    BACKGROUND

### A.    Factual Background

The general facts of this case have previously been detailed in the memorandum opinion found at ECF 26. However, given the more fulsome record at this stage of the litigation, the Court will recount those facts in greater detail here.

On the night of March 23, 2019, Plaintiffs ate dinner before heading to Abner's to meet up with Mr. Lehan's adult son Brandon, Brandon's girlfriend, and her father. ECF 63-2, at 13, 41:5–8 (Ms. Lehan's Deposition). Ms. Lehan described Abner's as a "crab house and restaurant" that also offered gaming such as "slots" and "bingo." *Id.* at 5, 13:17–22. Ms. Lehan had actually worked at Abner's when she was a teen, *id.* at 7, 15:8–10, and she and Mr. Lehan frequented the establishment "two or three times a month" in the years leading up to the incident, *id.* at 8, 16:17. On March 23, 2019, the Lehans arrived at Abner's around "9:15" or "9:30" p.m. and found their party. *Id.* at 14, 43:10–14. The party, including the Lehans, consumed a "shot" of alcohol and Ms. Lehan also had a "mixed drink." *Id.* at 16, 46:13–15, and 17, 47:13–14. Ms. Lehan recalled being in Abner's for roughly "30 minutes before the incident that gave rise to the lawsuit." *Id.* at 18, 49:11–13.

At the time of the incident, Wilson served as a Corporal with the Calvert County Sheriff's Office. ECF 55-2, at 5, 13:2 (Deposition of Wilson). Wilson also worked "secondary or part-

---

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

time" at Abner's providing security services, which was particularly necessary at Abner's because the bar also had "video bingo machines" where patrons could "win money." *Id.* at 6, 17:22, and 8, 25:14. Wilson was paid nightly by Abner's for his work, which was approved by the Calvert County Sheriff's Office. *Id.* at 7–8, 21:14–22:14. Wilson recalled that in March of 2019, there were likely ten to fifteen Sheriff's deputies who worked secondary employment at Abner's providing security. *Id.* at 8, 23:2–5.

Trouble began when the Lehans and the rest of their party were "standing, talking, and dancing by the bar." ECF 63-2, at 18, 49:17–20. Ms. Lehan recalls that Mr. Lehan was dancing and "lost his balance." *Id.* Mr. Lehan "bumped into a lady" who then "bumped into Wilson." *Id.* Ms. Lehan recalled that though Mr. Lehan apologized to the woman he'd bumped into, "the lady threw her hand up in [Mr. Lehan's] face," which caused "Wilson [to say] something to [Mr. Lehan]." *Id.* at 19, 50:2–6. This sequence of events, and what followed, was captured on Abner's security camera. *See* ECF 63-6 (cited as "Video Exhibit" and referenced in the text of this opinion as the "video").[3] Though the camera captured video of the incident, it did not pick up sound, so the footage has no accompanying audio.

As the video begins, Plaintiffs are visible on the far side of the bar, where they are dancing with their party. Video Exhibit, at 0:00–0:25. Mr. Lehan can be seen wearing a white baseball cap backwards and a gray sweater or sweatshirt. *Id.* Ms. Lehan is wearing a sleeveless black blouse. *Id.* Wilson can also be seen standing behind Plaintiffs with his back to the wall, talking to another customer. *Id.* Wilson appears to be wearing an official uniform issued by the Sheriff's

---

[3] With the Court's approval, *see* ECF 67, Plaintiffs supplied the Court with a digital copy of the surveillance video recording the March 23, 2019 events at Abner's. *See* ECF 63-6 and ECF 64 (Motion for Leave to File Electronic Document). Defendants do not dispute the video's authenticity. Indeed, Defendant Wilson cites to the footage as supporting his own version of the events. ECF 70, at 8. The video is part of the record, and the Court has thoroughly reviewed it.

Office, a fact Wilson confirmed in his deposition testimony, *see* ECF 55-2, at 11, 34:4–5. Shortly thereafter, the video footage shows Mr. Lehan appearing to move away from the bar, still dancing, and place a glass down on a nearby table. Video Exhibit, at 0:20–28. As he returns to his group, Mr. Lehan's right arm bumps into the customer talking to Wilson, causing her to move. Video Exhibit, at 0:27–0:29. Mr. Lehan then seems to take a step back towards Wilson and the customer Lehan had just bumped into, who moves out of his way. *Id.* at 0:30–0:31. Mr. Lehan remains close to Wilson but not facing him, then appears to turn his head over his right shoulder to say something in the direction of Wilson and the other customer. *Id.* at 0:34–0:35.

The video footage then shows Mr. Lehan speaking briefly to Wilson before turning his attention back to his family at the bar. Video Exhibit, at 0:35–38. The woman Mr. Lehan had previously bumped into extends her right hand in Mr. Lehan's direction, as described by Ms. Lehan in her deposition. *Id.* at 0:38–0:39; ECF 63-2, at 19, 50:2–4. Mr. Lehan returns to the nearby bar and continues dancing. Video Exhibit at 0:38–0:57. Ms. Lehan then appears to approach Wilson and speak to him for approximately ten seconds before turning back to the bar. *Id.* at 0:41–0:52. Thereafter, the video seems to show Wilson moving towards Ms. Lehan, and the two speak again. *Id.* at 0:55–1:18. During this second conversation, Mr. Lehan appears to turn back to both Wilson and Ms. Lehan and points his finger at Wilson before Ms. Lehan moves Mr. Lehan's hand away. *Id.* at 1:20–22. Ms. Lehan thereafter appears to indicate to Mr. Lehan that he return to the bar, which Mr. Lehan does. *Id.* at 1:23–26. Mr. Lehan is then seen engaging in conversation with an individual who appears to be his son Brandon, while Ms. Lehan continues to talk to Wilson. *Id.* at 1:28–2:00.

The parties vehemently dispute the nature and content of the conversations between Wilson and the Lehans depicted on the video. Plaintiffs aver that Mr. Lehan apologized but received only

4

a "dirty look" from Wilson in return, ECF 63-4, at 12, 86:11–12, while Wilson testified in his deposition that Mr. Lehan "start[ed] cussing [him] out," ECF 55-2, at 18, 63:20. According to Wilson, these conversations with Plaintiffs consisted of Ms. Lehan telling him "that Mr. Lehan is good" and that Wilson did not "need to worry about it," while Mr. Lehan kept "calling [him] a fucking rookie and a fucking tough guy and all this." ECF 55-2, at 18–19, 65:21–66:2. Ms. Lehan recalled Mr. Lehan saying that Wilson "must be a rookie" because Wilson "kept going at [Mr. Lehan]." ECF 63-2, at 50.    Ms. Lehan offers that it was Wilson who "started cussing at [her]" when she went over to explain that Mr. Lehan "was okay" and alleges that Wilson even "tapped [her] on the shoulder and told [her] to come back over to him" to continue swearing at her after she had initially walked away. ECF 63-2, at 19–20, 50:22–51:9. Ms. Lehan recalled telling Wilson that she "was aware of who [Wilson's] boss was, and that [she] was going to say something to him for the way that [Wilson] was acting and treating us because we weren't doing anything wrong." *Id.* at 20, 51:9–13.

At around the two-minute mark on the video, Mr. Lehan appears to call out to someone across the restaurant, Mike Mudd, a Sheriff's Deputy who also worked secondary employment at Abner's,[4] and Mr. Lehan gestures for Mudd to come over to where Mr. Lehan, Ms. Lehan, and Wilson were standing. Video Exhibit, at 2:00–2:01. Mr. Lehan then seems to speak briefly to Wilson before gesturing to Mudd again. *Id.* at 2:05–2:12. Wilson also appears to gesture to Mudd at the same time. *Id.* at 2:13. Mudd then approaches Wilson and the Lehans. *Id.* at 2:14–2:19.

---

[4] In deposition testimony, Mudd identified himself as a detective at the Calvert County Sheriff's Office and an occasional provider of security at Abner's through a secondary employment arrangement at the Sheriff's Office. ECF 63-5, at 4, 12:14–19 and 5, 15:3–20. He indicates that he knew the Plaintiffs largely through their patronage of Abner's, though they had "never gone out socially or hung outside of work," and described their relationship as "cordial." *Id.* at 7, 36:7–38:13.

Mudd is seen speaking with Wilson before Mr. Lehan starts to address Mudd as well. *Id.* at 2:20–

2:46. Thereafter, both Mr. Lehan and Ms. Lehan turn back to the bar, while Mudd steps between

the parties to face Wilson. *Id.* at 3:05–3:07. Mudd appears to speak with Wilson alone for about

forty seconds before Mudd steps away. *Id.* at 3:07–3:47. Mudd was also deposed in the course of

this litigation and testified that during the conversation captured on video, Wilson said he felt

Plaintiffs "had too much to drink, and he wanted them to leave." ECF 63-5, at 14, 50:1–2. Mudd

also testified that he thereafter "spoke to Mr. Lehan" and told him "that this was no big deal" and

to "just go home and have a good evening and come back on a later date." *Id.* at 14, 50:19–20.

According to Mudd, Mr. Lehan complied with this directive and began "paying his bill." *Id.* at

15, 51:8–12.

The video shows that after Mudd walked back to his post on the other side of the restaurant,

Plaintiffs remained at the bar. After the four-minute mark, the footage shows Mr. Lehan turning

around to address Wilson again. Video Exhibit, at 4:13. At this point, Wilson appears to gesture

for Mudd to return. *Id.* at 4:21. When Mudd returns, he is seen standing between Plaintiffs and

Wilson, with his back to Plaintiffs, as he talks to Wilson. *Id.* at 4:34–4:50. Mudd then appears to

approach Plaintiffs and speak to both of them. *Id.* at 4:52–5:10. In deposition, Mudd testified that

when he came over a second time, Wilson told him "it was time for [Plaintiffs] to go" and that

Wilson "wanted [Plaintiffs] removed from the bar." ECF 63-5, at 19, 56:8–9. Mudd also attested

that he again told the Plaintiffs that everything was "okay" and they should "settle up, pay [their]

tab, just go home, have a good evening and come back on a later date." *Id.* at 20, 57:3–5.

While Mudd was speaking to Plaintiffs, the video shows that Mr. Lehan appears to lean

around Mudd's left shoulder to address Wilson. Video Exhibit, at 5:11. The video next shows

Wilson approaching Mr. Lehan, moving Mudd to the side, grabbing Mr. Lehan, and pulling him

off his seat at the bar. *Id.* at 5:12–5:17. Wilson and Mr. Lehan then physically struggle for several seconds, as Ms. Lehan, Brandon, other members of their party, and another customer at the bar attempt to intervene. *Id.* at 5:19–5:25. At some point, flashes of light are visible on the footage, and Mr. Lehan appears to be waving his arms. *Id.* at 5:24–5:25. The video then shows Wilson striking Mr. Lehan multiple times in the area of Mr. Lehan's head and upper body before Mr. Lehan appears to fall to the ground. 5:26–5:30. On the video, Ms. Lehan appears to struggle to move toward the space where Mr. Lehan was on the ground. *Id.* at 5:36–5:42. Brandon is then seen trying to separate Ms. Lehan from Mr. Lehan as he and another patron remove Ms. Lehan to a different area of the bar. *Id.* at 5:43–5:50. The footage indicates that Mr. Lehan remained on the ground for nearly a minute before he was brought to his feet by Mudd. *Id.* at 6:35. The video then shows Ms. Lehan returning to Mr. Lehan before other customers hold her back from following him as Mudd escorts him out. *Id.* 6:38–6:54.

Following Mr. Lehan's removal from Abner's, the video shows Wilson returning to the bar and gesturing for Ms. Lehan to leave as well. Video Exhibit, at 6:59–7:01. Ms. Lehan is then seen on the video slowly moving back towards the bar before Wilson approaches, takes hold of her arm, and begins handcuffing her as she appears at one point to try to bring her arms forward. *Id.* at 7:04–7:40. Wilson then leads Ms. Lehan out of the restaurant. *Id.* at 7:43–7:44.

Following the events at Abner's, the Lehans were "both charged with second degree assault of a law enforcement officer, disorderly conduct, failure to obey, and resisting or interfering with an arrest." ECF 1, at 9 ¶ 29. They aver that they "did not commit any of these crimes, which was obvious to all those present at the time and obvious from film of the incident." *Id.* A bench trial was held for both Plaintiffs in the District Court for Calvert County on July 24, 2019. *Id.* ¶ 31 (citing *State v. Tamara Wood Lehan*, Case No. D-041-CR-19-000636; *State v. Richard Kevin*

*Lehan*, Case No. D-041-CR-19-000637). At the conclusion of trial, Plaintiffs "were both found not guilty as to all charges." *Id.* at 10 ¶ 36. Defendant Wilson acknowledges the outcome of the criminal trial. *See* ECF 70, at 10.

### B.   Procedural History

Plaintiffs filed this lawsuit on February 12, 2021. *See* ECF 1. Initially, they sued Wilson, the Calvert County Board of County Commissioners, the State of Maryland, and A&A. ECF 26, at 1. On April 29, 2021, Plaintiffs voluntarily dismissed their claims against the State of Maryland. ECF 23. On March 8, 2022, Judge Hazel issued a memorandum and order granting dismissal of most the claims then pending against original defendant Calvert County Board of County Commissioners while granting in part and denying in part A&A's motion to dismiss. *See* ECFs 26 and 27. In a separate memorandum and order issued on January 11, 2023, Judge Hazel dismissed the remaining counts against Calvert County Board of County Commissioners. *See* ECFs 38 and 39. On February 22, 2023, the case was reassigned to Judge Russell before being transferred to the undersigned on October 18, 2023.

Ten counts of the original thirteen remain at this stage in the action. Count I of the complaint brings a claim pursuant to 42 U.S.C. § 1983 for excessive force against Wilson, in his official capacity, as brought by Mr. Lehan; Count II brings a claim pursuant to 42 U.S.C. § 1983 for unlawful seizure of Mr. Lehan against Wilson in his official capacity; Count III brings a claim for excessive force used on Mr. Lehan against Wilson in his individual capacity; Count IV asserts a claim brought by both Plaintiffs for unlawful seizure against Wilson in his individual capacity; Count V asserts a claim for battery brought by Mr. Lehan against Wilson as well as vicariously against A&A; Count VI articulates a claim for false arrest brought by both Plaintiffs against Wilson and vicariously against A&A; Count VII is a claim for malicious prosecution brought by both Plaintiffs against Defendant Wilson; Count X asserts a claim by Mr. Lehan against Wilson for use

of excessive force in violation of Article 24 of the Maryland Declaration of Rights; Count XI is a claim for excessive force and deprivation of liberty in violation of Article 26 of the Maryland Declaration of Rights, brought by both Plaintiffs against Defendant Wilson; and Count XIII brings a claim by both Plaintiffs against Defendant Wilson for intentional infliction of emotional distress. ECF 1, at 12–38.

Defendant Wilson's motion seeks an award of summary judgment with respect to Ms. Lehan's claims against him, i.e., Counts IV, VI, VII, XI, and XIII. ECF 55-1, at 2. A&A, meanwhile, argues that it is entitled to judgment as a matter of law as to Counts V and VI. ECF 80, at 1. Wilson does not seek summary judgment on any claims brought solely Mr. Lehan (Counts I, II, III, V, and X) nor does he seek summary judgment with respect to Mr. Lehan's claims in the counts brought jointly by the Lehans (Counts IV, VI, VII, XI, and XIII).

## II.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 608 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact

9

is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III.    ANALYSIS

The Court will consider each party's motion and the relevant issues thereunder in turn.

### A. Defendant Wilson's Motion for Summary Judgment

Wilson argues that he is entitled to summary judgment on all claims brought by Ms. Lehan because all of her claims hinge on whether there was probable cause for her arrest, and that he did, in fact, have probable cause to effectuate her arrest when she attempted to interfere with Wilson's arrest of Mr. Lehan. In particular, Wilson asserts that "the record is clear and undisputed based on [Ms. Lehan's] own admissions that during her husband's arrest she either jumped on or grabbed hold of Deputy Wilson to interfere—in other words, she assaulted him." ECF 55-1, at 2. Because Ms. Lehan "used physical force to attempt to prevent [Wilson] from arresting Mr. Lehan" when she was not entitled to, Wilson contends, she was properly charged with "disorderly conduct, failing to obey a lawful order (to leave Abner's), interfering with [Mr. Lehan's] arrest, and assault in the second degree upon Deputy Wilson." *Id.* at 6. As such, Wilson argues, "it is clear that [he] had probable cause to charge [Ms.] Lehan." *Id.* Ms. Lehan counters that a reasonable jury could find that Wilson lacked probable cause to arrest Ms. Lehan for interfering with an arrest, for disorderly conduct, and for failure to obey a lawful order. ECF 63-1, at 18, 20, 26. The Court will assess whether there exists any genuine dispute of material fact regarding the presence of probable cause to arrest Ms. Lehan and the impact of such on each of her claims.

#### 1. 42 U.S.C. § 1983 Claims (Count IV)

##### i. *Unlawful seizure*

Ms. Lehan brings a claim against Wilson in his individual capacity for unlawful seizure in violation of the Fourth Amendment, arguing that her arrest was "unlawful" and that she had "not engaged in any unlawful conduct."[5] ECF 1, at 20 ¶¶ 86, 88. The Fourth Amendment protects the

---

[5] Ms. Lehan also asserts in the same count that Wilson's conduct offended the due process requirements of the Fourteenth Amendment. ECF 1, at 20 ¶ 86. However, as the Fourth Circuit has observed, claims of unlawful seizure "directly implicate the Fourth Amendment," and "[d]ressing a Fourth Amendment claim up in due process language does not transform it into a

11

"right of the people to be secure in their persons . . . against unreasonable searches and seizures."

U.S. Const. amend. IV. "A seizure is unreasonable under the Fourth Amendment if it is not based

on probable cause." *Hupp v. Cook*, 931 F.3d 307, 318 (4th Cir. 2019) (*citing Dunaway v. New

York*, 442 U.S. 200, 213 (1979)). "Thus, '[i]f a person is arrested when no reasonable officer could

believe . . . that probable cause exists to arrest that person, a violation of a clearly established

Fourth Amendment right to be arrested only upon probable cause ensues.'" *Id.* (alterations in

original) (quoting *Rogers v. Pendleton*, 249 F.3d 279, 290 (4th Cir. 2001)).

Wilson argues that he had probable cause to arrest Ms. Lehan for committing four separate

offenses, namely, "disorderly conduct, failing to obey a lawful order (to leave Abner's), interfering

with [Mr. Lehan's] arrest, and assault in the second degree upon Deputy Wilson." ECF 55-1, at

6. The charges, Wilson argues, arose from Ms. Lehan "grabb[ing] hold of Deputy Wilson in an

effort to interfere in her husband's arrest," which Wilson asserts that Ms. Lehan herself admitted

in her deposition. *Id.* at 7. This "non-consensual touching of Deputy Wilson and interference in

the arrest," Defendant Wilson contends, "gave rise to probable cause to arrest [Ms. Lehan]." *Id.*

Ms. Lehan responds that Maryland law permits third parties to intervene in arrests where an officer

makes "unlawful arrest" and that because the arrest of her husband was, in fact, unlawful, she

herself did not break the law by attempting to intervene. ECF 63-1, at 24. Further, she contends,

there exists a dispute of fact as to whether Ms. Lehan committed an assault against Defendant

Wilson in her attempts to intervene, as she testified at deposition that she could not even recall if

she had ever made contact with Wilson during the encounter. *Id.* at 25 (quoting ECF 63-2, at 40,

90:7 ("I don't even know that I grabbed [Wilson] at either time.")). Finally, Ms. Lehan argues that

---

Fourteenth Amendment claim" where the Fourth Amendment already provides the relevant
framework. *Smith v. Travelpiece*, 31 F.4th 878, 884–85 (4th Cir. 2022). Accordingly, the Court
considers Count IV as a claim implicating the Fourth Amendment alone.

there are likewise genuine disputes of material fact as to whether Wilson had probable cause to arrest her for disorderly conduct or for failing to obey a lawful order, since, in her account, her conduct at the time of the arrest of her husband did not rise to the legal standard of "disorderly" nor did she fail to obey Wilson's order to leave but only returned to the bar to retrieve her purse before she was handcuffed. *Id.* at 26–27.

As to Ms. Lehan's point regarding the right to intervene in an unlawful arrest, it is true that Maryland law "recognize[s] that a person has the right to intervene with force in the defense of another person subject to an unlawful arrest." *Lamb v. State*, 786 A.2d 783, 798 (Md. App. 2001) (citing *Glover v. State*, 594 A.2d 1224, 1229 (Md. 1991)); *see also Att'y Grievance Comm'n of Md. v. Mahone*, 76 A.3d 1198, 1211 (Md. 2013) ("It is well settled that a person has the right to resist an unlawful arrest.") (collecting cases). Such interference must consist of only such force as "is reasonably demanded by the situation" and no more. *Glover*, 594 A.2d at 1229. Nonetheless, even if a person legitimately resisted or intervened to prevent an unlawful arrest, "the question [of] whether a person committed the offense of resisting arrest is distinct from the question of whether an officer had probable cause to believe that the person committed the offense." *Middleton v. Koushall*, Civ. No. 20-3536-ELH, 2024 WL 1967816, at \*41 (D. Md. May 3, 2024).

The question of the lawfulness of Mr. Lehan's arrest is not before the Court, as Wilson has not moved for summary judgment on claims related to his interactions with Mr. Lehan. The Court will therefore not undertake an analysis related to the lawfulness of the arrest of Mr. Lehan.[6]

---

[6] It bears noting that a cursory review of the materials submitted as they relate to Mr. Lehan reflects an obvious dispute of material fact as to whether the arrest of Mr. Lehan was supported by probable cause. All participants in the events of March 23, 2019 tell different stories during their depositions and the video fails to definitively settle key questions of fact, most notably what Mr. Lehan did that merited their arrests and whether the force ultimately used by Wilson—seen clearly on the

Rather, the relevant question is, as Judge Hollander framed it in *Middleton*, whether there is a genuine dispute of material fact as to whether Wilson had probable cause to believe that Ms. Lehan committed the offense of impermissibly intervening in the arrest of her husband. 2024 WL 1967816, at *41–42. The Court determines that, viewed in the light most favorable to Plaintiffs, there does exist such a dispute. Given that the underlying questions, principally the issue of the lawfulness of Mr. Lehan's arrest, cannot be resolved at this stage, the Court cannot conclude that Wilson is entitled to summary judgment as to Ms. Lehan's section 1983 claims on the basis of her interference with Wilson's arrest of her husband. *See Allotey v. Baltimore Cnty., Md.*, Civ. No. 21-02288-JMC, 2022 WL 17105120, at *10 (D. Md. Nov. 22, 2022) (finding that the question of probable cause for arrest is properly left to the determination of the jury where it is disputed whether a plaintiff validly "resist[ed] an unlawful arrest"); *Wall v. Gulledge*, Civ. No. 1:22-31, 2025 WL 976703, at *7 (M.D.N.C. Mar. 31, 2025) (determining that summary judgment was not appropriate where the court could not resolve the question of whether a plaintiff was acting "within her right to resist an unlawful arrest"); *Andersen v. Haynes,* No. 1:07CV2, 2009 WL 2591277, at *14 (N.D.W. Va. Aug. 21, 2009) (declining to grant summary judgment to an officer defendant where a plaintiff had a "reasonable" belief that the officer's "attempts to arrest him were unlawful" in light of state law permitting resistance of unlawful arrest).

video as closed-fist punches to Mr. Lehan's head and upper body when Mr. Lehan was already being restrained—was excessive. Video Exhibit, at 5:23–5:29. Though portions of the video may support an interpretation of the facts more favorable to Wilson, the Fourth Circuit has cautioned that summary judgment is not merited "whenever documentary evidence, such as a video, offers *some* support for a governmental officer's version of events." *Witt v. W. Virginia State Police, Troop 2*, 633 F.3d 272, 276–77 (4th Cir. 2011) (emphasis in original). Only when such video evidence "'blatantly contradict[s]' a plaintiff's account 'so that no reasonable jury could believe it,' [should] a court [ ] not credit the plaintiff's version on summary judgment." *Id.* (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Such is not the case here where Plaintiffs offer a narrative that is often supported by the video, not contradicted. At best, the video evidence suggests that Wilson's account is possible, not that it is the sole version of events borne out by the footage.

14

It bears noting that even if the Court chose to engage on the subject of Mr. Lehan's arrest, it is far from clear whether Wilson had probable cause to arrest Ms. Lehan for unlawfully attempting to intervene. *See,* supra, n.7. As noted, the law is clear that in Maryland, "a person has the right to intervene with force in the defense of another person subject to an unlawful arrest." *Lamb,* 786 A.2d at 798 (citation omitted). Thus, the question of the lawfulness of Mr. Lehan's arrest, a question subject to an intense dispute of material fact, remains center to the dispute of whether Wilson had probable cause to believe that Ms. Lehan was unlawfully interfering in that arrest. Moreover, there appears to be a dispute of material fact as to whether Ms. Lehan actually did intervene physically, with Wilson pointing to deposition testimony seeming to establish that she did, *see* ECF 55-1, at 4–5, and Ms. Lehan citing to testimony casting doubt on the truth of that allegation, *see* ECF 63-1, at 25.

The Court further concludes that there is a dispute of material fact regarding whether probable cause existed to arrest Ms. Lehan for either disorderly conduct or failure to obey a lawful order. Wilson argues that Ms. Lehan's behavior during the arrest of her husband "result[ed]" in a charge of "disorderly conduct," for which he also had probable cause to arrest her. ECF 55-1, at 6. However, as the Court does not resolve at this stage whether there was probable cause to arrest Ms. Lehan for intervening, licitly or otherwise, in the arrest of her husband, the Court also cannot resolve whether her behavior amounted to illegal "disorderly conduct." In addition, the Court finds that there is a dispute of fact over whether Wilson had probable cause to arrest Ms. Lehan for failure to obey his order to leave Abner's notwithstanding the fact that Wilson testified in his deposition that he believed he did. ECF 55-2, at 49, 186:7. Ms. Lehan testified that she was only returning to the bar to retrieve her purse and that she attempted to inform Wilson of as much before he placed her in handcuffs. ECF 63-2, at 22, 53:18–22. Moreover, the video footage reflects that,

following Wilson's gesture for her to leave Abner's, Ms. Lehan moved back toward the bar for only a few seconds before Wilson placed her in handcuffs. Video Exhibit at 7:04–7:10. Because there is a dispute of fact as to whether Wilson could determine whether Ms. Lehan was attempting to comply with the order or was disregarding it, and thus whether Wilson had probable cause to arrest Ms. Lehan, the Court cannot conclude at this stage that Wilson did or did not have probable cause to arrest Ms. Lehan for failure to obey a lawful order.

### ii.    Qualified Immunity

Wilson argues that, notwithstanding any dispute about probable cause for his arrest of Ms. Lehan, he is entitled to qualified immunity as to Ms. Lehan's section 1983 claims on the grounds that, at the time he arrested Ms. Lehan, "there was no authority in the Fourth Circuit that would have put [him] on notice that if someone physically attempts to prevent you from effectuating an arrest, that you are not then legally entitled to arrest them." ECF 55-1, at 9. Wilson's argument, however, assumes as fact that Ms. Lehan attempted to physically prevent Wilson from a making a lawful arrest. As noted above, the facts are far from clear cut and thus the application of qualified immunity is not as easy to answer as Wilson posits it is.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The immunity [inquiry] balances two important interests: 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Atkinson v. Godfrey*, 100 F.4th 498, 504 (4th Cir. 2024) (quoting *Pearson*, 555 U.S. at 231). "The protection applies regardless of whether the government official's error is a mistake of law, a mistake of fact or a mistake based on mixed

16

questions of law and fact." *Id.* (citing *Pearson*, 555 U.S. at 231). "It gives 'government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (citing *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam)).

Qualified immunity "typically involves two inquiries: (1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892, 898 (4th Cir. 2016) (internal quotation marks omitted). The second step of the analysis acknowledges that even officers who violate a plaintiff's constitutional rights may be entitled to qualified immunity, provided that the right in question is not so clearly established "that every reasonable official would have understood that what [they are] doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up) (citation omitted). "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand what he is doing is unlawful." *Garrett v. Clarke*, 74 F.4th 579, 584 (4th Cir. 2023) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

"To determine whether a right is clearly established, [the Court must] assess whether the law has 'been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state.'" *Wilson v. Prince George's Cnty., Md.*, 893 F.3d 213, 221 (4th Cir. 2018) (citing *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998)). "A right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity." *Id.* (citations omitted). However, courts are "not to define clearly established law at a high level of generality," as "[s]pecificity is especially important in the Fourth Amendment context." *Kisela v. Hughes*, 584 U.S. 100, 104

(2018) (internal citations omitted). "Defining the right at a high level of generality 'avoids the crucial question whether the offic[er] acted reasonably in the particular circumstances that he or she faced.'" *Atkinson*, 100 F.4th at 505 (citing *Wesby*, 583 U.S. at 63) (alteration in *Atkinson*). "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle*, 566 U.S. at 664 (internal quotation marks omitted).

In the context of a Fourth Amendment claim for unlawful seizure or arrest, "whether a plaintiff's right to be free from arrest is clearly established turns not on whether there actually was probable cause . . . but whether an objective law officer could reasonably have believed probable cause to exist." *Thurston v. Frye*, 99 F.4th 665, 676 (4th Cir. 2024). In factually similar cases, other district courts within the Fourth Circuit have concluded that "if an attempt to arrest . . . was not based on probable cause," then a plaintiff was "within [their] right to resist that arrest and [an officer] cannot establish that [they] had probable cause to arrest [a plaintiff] for obstructing an officer," and qualified immunity is therefore not available. *Andersen*, 2009 WL 2591277, at *14; *see also Allotey*, 2022 WL 17105120, at *10 (finding that because the Fourth Amendment right to be free from arrest without probable cause is "clearly established," and because officers had not "established the existence of probable cause permitting the arrest of plaintiff," the court could not "determine that [d]efendants had qualified immunity" as to the plaintiff's federal claims).

The Court considers the issue further by way of an analogy to a recent decision of another court in this district. In *Brooks v. McKimmie*, an arresting officer testified that the plaintiff refused the officer's command to open the door of his hotel room and so was arrested for trespassing, while the plaintiff testified that he was not disobeying but was actually attempting to open the door. 23-0208-DLB, 2025 WL 1018882, at *7 (D. Md. Apr. 4, 2025). In considering whether the officer was entitled to qualified immunity, Judge Boardman reasoned first that if the plaintiff was, indeed,

attempting to comply with the officer's commands, the officer "would not reasonably believe that he had probable cause to arrest" the plaintiff, and the plaintiff had "a clearly established right to be free from arrest under these circumstances." *Id.* at *13. As such, Judge Boardman determined that the officer could not establish he was entitled to qualified immunity on a plaintiff's false arrest claim because the parties disputed whether the officer "reasonably believed" that probable cause for arrest existed. *Id.* The Court finds the parallel instructive.

Applying the logic of *Brooks*, if Ms. Lehan was not committing an offense but instead licitly attempting to intervene in an unlawful arrest, her right to be free from arrest herself was clearly established. *See Lamb*, 786 A.2d at 798. In a situation where an individual is lawfully intervening in an unlawful arrest, an officer could not "reasonably believe" that they had probable cause to arrest the individual, and so qualified immunity is not warranted. This is particularly true where, as here, the degree to which Ms. Lehan purportedly attempted to intervene is in dispute, if she even did so at all. Accordingly, the Court cannot grant summary judgment to Wilson on the basis of qualified immunity.

2.    Article 26 Maryland Declaration of Rights Claim (Count XI)

Article 26 of the Maryland Declaration of Rights ("MDR") is the state analogue to the Fourth Amendment. *Padilla v. State*, 949 A.2d 68, 77 (Md. App. 2008); *see also Dent v. Montgomery Cnty. Police Dep't*, 745 F. Supp. 2d 648, 661 (D. Md. 2010) ("Article 26 protects the same rights as those protected under the Fourth Amendment to the United States Constitution . . . ."). Article 26 is interpreted *in pari materia* with its federal analogue. *See Stutzman v. Krenik*, 350 F. Supp. 3d 366, 377 (D. Md. 2018) ("Maryland courts construe Article 26 *in pari materia* with the Fourth Amendment, such that its comparable provisions are essentially equated to the Fourth Amendment's protections against unreasonable searches and seizures."). Thus, the Court's analysis of Ms. Lehan's federal constitutional claim controls the disposition of her claim under the

19

Maryland Declaration of Rights. *See Middleton*, 2024 WL 1967816, at *38. Because the Court has determined that summary judgment is not appropriate as to Ms. Lehan's federal constitutional claims, the same conclusion is warranted as to her claims alleging violations of Article 26 of the MDR. *Id.*

### 3.    State Tort Claims (Counts VI, VII, XIII)

Along with her husband, Ms. Lehan brings claims for false arrest, malicious prosecution, and intentional infliction of emotional distress. Under Maryland law, the elements of false arrest are "(1) a deprivation of the liberty of another; (2) without consent; and (3) without legal justification." *Rovin v. State*, 321 A.3d 201, 222 (Md. 2024). The elements of a malicious prosecution claim, meanwhile, are "1) a criminal proceeding instituted or continued by the defendant against the plaintiff; 2) without probable cause; 3) with malice, or with a motive other than to bring the offender to justice; and 4) termination of the proceedings in favor of the plaintiff." *Heron v. Strader*, 761 A.2d 56, 59 (Md. 2000). In the context of an alleged unlawful arrest, "the 'malice' element of malicious prosecution may be inferred from a lack of probable cause." *Montgomery Ward v. Wilson*, 664 A.2d 916, 925 (Md. 1995). Finally, a plaintiff claiming intentional infliction of emotional distress ("IIED") must claim that, "(1) the defendant's conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the wrongful conduct and the emotional distress; and (4) that the emotional distress was severe." *Borchers v. Hyrchuk*, 126 Md. App. 10, 18, 727 A.2d 388, 392 (1999). In Maryland, an IIED claim is "rarely viable," *id.*, and courts have imposed "liability sparingly and . . . limited the tort to situations where the 'wounds are truly severe and incapable of healing themselves,'" *Lee v. Queen Anne's Cty. Off. of Sheriff*, Civ. No. 13-672-RDB, 2014 WL 476233, at *16 (D. Md. Feb. 5, 2014) (quoting *McDaniel v. Maryland*, Civ. No. 10-00189-RDB, 2010 WL 3260007, at *9 (D. Md. Aug. 18, 2010)).

As to Ms. Lehan's false arrest claim, because there is a genuine dispute of fact as to whether Wilson had probable cause to arrest her, the Court may not grant summary judgment in Wilson's favor. *See Brooks*, 2025 WL 1018882, at *5. Moreover, with respect to Ms. Lehan's malicious prosecution claim, again because there exists a dispute of fact as to probable cause for her arrest and therefore whether Wilson acted with malice, the Court may also not grant summary judgment to Wilson on that claim. *See Okwa v. Harper*, 757 A.2d 118, 133 (2000) (finding genuine dispute of material fact regarding the existence of malice on the part of a defendant officer where there was a dispute as to whether the predicate arrest of a plaintiff was supported by probable cause). Finally, as to Ms. Lehan's intentional infliction of emotional distress claim, Judge Hazel previously determined that Plaintiffs failed to state a claim for such with respect to Defendant A&A Gaming and so dismissed the claim. ECF 26, at 24-25. Ms. Lehan's IIED claim against A&A was predicated on a theory of vicarious liability for the alleged tort of IIED committed by Wilson. ECF 1, at 39 ¶ 184. Thus, since Judge Hazel already found that Plaintiffs failed to state a claim for their underlying IIED, the Court here finds that Wilson is entitled to summary judgment on Ms. Lehan's IIED claim.[7]

---

[7] Wilson has not argued that he is entitled to qualified immunity as to Ms. Lehan's state tort claims. The Court notes that, "in Maryland, public official immunity applies to torts consisting of 'negligence actions or defamation actions based on allegedly negligent conduct.'" *Phelan v. Atack*, Civ. No. TDC-19-1867, 2020 WL 7043931, at *3 (D. Md. Dec. 1, 2020) (citing *Lee v. Cline*, 863 A.2d 297, 305 (Md. 2004)). "Police officers are deemed to be public officials for purposes of public official immunity." *Id.* (citations omitted). However, public official immunity is not available in actions alleging intentional torts such as false imprisonment, assault, or battery. *Thomas v. City of Annapolis*, 688 A.2d 448, 454 (Md. App. 1997) (citing *Ashton v. Brown*, 660 A.2d 447, 470 (Md. 1995)); *see also Houghton v. Forrest*, 989 A.2d 223, 229 (Md. 2010). Moreover, the applicable statute, Section 5-507 of the Maryland Courts & Judicial Proceedings Article, merely "codif[ies] existing public official immunity and [does] not [] extend the scope of qualified immunity beyond its Maryland common law boundaries." *Lovelace*, 785 A.2d at 734 (citing *Ashton*, 660 A.2d at 470 n.23 and Md. Code Ann., Cts. & Jud. Proc. § 5-507(a)(1)). Because Ms. Lehan has alleged that Wilson engaged in intentional torts, not negligence, qualified immunity is not available as to her state tort law claims.p

## B.    A&A's Motion for Summary Judgment

Defendant A&A has also moved for summary judgment, arguing that Plaintiffs' remaining claims against it—battery brought by Mr. Lehan vicariously against A&A (Count V) and false arrest brought by both Plaintiffs vicariously against A&A (Count VI)—fail because Wilson was an independent contractor rather than an A & A employee. ECF 80-1, at 8. Plaintiffs respond that the question of whether an employment relationship existed between Defendant Wilson and A&A is a question for the trier of fact. ECF 84-1, at 17.

Maryland law recognizes a general distinction between an employee and an independent contractor defined by degree of control[8]; employers generally have "the power to control the [employee's] conduct," *Chevron, U.S.A., Inc v. Lesch*, 570 A.2d 840, 844 (Md. 1990), while an independent contractor "retain[s] control over the manner of" performing the work or services in question, *Perry v. Asphalt & Concrete Servs., Inc.*, 133 A.3d 1143, 1155 (Md. 2016). While an employer may be held "vicariously liable for the acts of its employee, within the scope of employment," *id.*, the "general rule is that the employer of an independent contractor is not liable for the negligence of the contractor or his employees," *Rowley v. Mayor & City Council of Balt.*, 505 A.2d 494, 496 (Md. 1986) (internal citation omitted).

In response to A&A's motion for summary judgment, Plaintiffs contend that there exists a dispute of fact as to whether Wilson was an independent contractor or an employee of A&A.

---

[8] A&A argues that courts are to consider five factors—power to select and hire, payment of wages, power of discharge, power to control conduct, and whether the work is part of the employee's regular business—in determining the existence of an employer-employee relationship and cites in support the Appellate Court of Maryland's holding in *Asphalt & Concrete Servs., Inc. v. Perry*, 108 A.3d 558, 580 (Md. App. 2015). However, the Appellate Court also observed that the "most important factor" is "the right to control and direct the employee in the performance of the work," *id.*, a finding reiterated by the Supreme Court of Maryland when it reviewed the same case in *Perry*, 133 A.3d at 1161–62. *See also Whitehead v. Safway Steel Prods., Inc.*, 497 A.2d 803, 809 (Md. 1985) (recognizing that, "standing alone," control is sufficient to indicate the existence of an employer-employee relationship).

Specifically, Plaintiffs contend that the record reflects that A&A "exercised control over the conduct of its security guards" when it provided instructions to the guards as to how to perform their duties. ECF 84-1, at 23. A&A disputes this conclusion, arguing both that Plaintiffs mischaracterize deposition testimony pertaining to the officers' duties at Abner's and that Abner's only "occasionally" gave general instructions to the officers but did not control the performance of the officers' duties. ECF 94, at 3–4. On review of the record at the summary judgment stage, the Court concludes that it cannot determine that Wilson was acting as an independent contractor as opposed to an employee of Abner's. While the Supreme Court of Maryland has stressed that "the most important operational distinction between the employer-employee and independent contractor relationships is control," *Hancock v. Mayor & City Council of Balt.*, 281 A.3d 186, 197 (Md. 2022), it has also held that an employer need not "have exercised control over all the details" of how a service was performed for the provider to qualify as an employee rather than an independent contractor, *Lovelace v. Anderson*, 785 A.2d 726, 743 (Md. 2001).

Here, Wilson indicated in deposition testimony that he did not have a formal hire interview with Abner's, did not have an "employment agreement or letter of employment," and did not receive specific training from Abner's on how to perform his duties. ECF 55-2, at 8, 24:8–25:1, and 12, 40:17–19. However, Wilson also testified that managers of Abner's could direct security to "ban" disorderly patrons from the premises, but security guards could not do so on their own. ECF 55-2, at 12, 38:20–39:5. Mudd confirmed the same in his deposition. *See* ECF 84-4, at 14, 24:12–14. In *Lovelace*, the Supreme Court of Maryland found that a hotel exercised control over an off-duty police officer serving as hotel security where the hotel specified "duties" for which the guards were hired, required certain dress, directed the guards' handguns be concealed, and gave the guards particular assignments. *Lovelace*, 785 A.2d at 743. Though the record in *Lovelace* was

more fulsome as to the varieties of specific conduct under the control of the hotel, Wilson's

testimony in the case at hand suggests that A&A did exercise control over at least one significant

aspect of the guards' performance of their duties, namely, whether and when to ban patrons from

the establishment. "If a party produces *any* legally sufficient evidence to prove the existence of

an agency or employment relationship, it becomes a question of fact that must be submitted to the

fact finder."[9] *White v. Date Trucking, LLC*, Civ. No. 17-1177-ELH, 2018 WL 2462921, at *10

(D. Md. June 1, 2018) (citing *S. Mgmt. Corp. v. Taha*, 836 A.2d 627, 639 n.2 (Md. 2003))

(emphasis added). Accordingly, the Court cannot, at this time, conclude that, as a matter of law,

Wilson was an independent contractor of A&A.

Moreover, the Court does not agree with A&A's position that *Lovelace* is inapplicable in

the present case. Though A&A is correct that the specific facts of the case in *Lovelace* concerned

use of force rather than arrest, the *Lovelace* court specifically contemplated that an establishment

employing off-duty police as security guards cannot "immunize itself from liability for an unlawful

arrest whenever the officer acts upon his own initiative." 785 A.2d at 744 (quoting *Dillard Dep't*

*Stores v. Stuckey*, 256 Ark. 881, 883 (1974)). While it is true that A&A did not bestow powers of

arrest upon Wilson, that is not the operative question on which liability turns; instead, courts look

to, *inter alia*, "whether the action was in furtherance of the employer's business," "was related to

the employee's duties," or "whether the employer had reason to expect that the type of action

---

[9] A&A takes issue with some of the deposition evidence cited by Plaintiffs in their response in opposition. A&A argues that Plaintiffs omitted the fact that some of the testimony had been elicited by an improper question, which counsel objected to in deposition. ECF 94, at 3. The specific question at issue was, "[a]nd was this just basically, you were going to do whatever you were directed by Abner's and [Captain] Ronnie Naughton [captain at the Calvert County Sheriff's Office] to provide security?" and A&A contends that it incorrectly conflated Naughton and Abner's as sources of authority, therefore warranting objection. *Id.* at 2 (quoting ECF 55-2, at 8, 25:2–5). However, the Court does not look to this portion of Wilson's deposition testimony in reaching its conclusion that summary judgment may not be granted to A&A at this stage.

might occur" to determine if an action was "within the scope of the employment relationship[.]" *Id.* at 742. A&A is therefore not entitled to summary judgment on Plaintiffs' false arrest claim on the grounds that they did not confer such a power on Wilson.[10]

## IV.    CONCLUSION

For the foregoing reasons, Defendant Wilson's motion is GRANTED in part as to Plaintiffs' IIED claims and DENIED in part as to the remainder of Ms. Lehan's claims. Defendant A&A's motion is DENIED.

A separate implementing Order will issue.

Dated: <u>April 30, 2025</u>                                   <u>/s/</u>
                                                        Brendan A. Hurson
                                                        United States District Judge

---

[10] Third party Scottsdale Insurance Company ("Scottsdale") provides liability insurance to A&A and has filed a motion to intervene for the limited purpose of propounding special jury instructions. *See* ECF 88. A&A filed a response in opposition on April 22, 2025, *see* ECF 99, and Scottsdale's reply is due by May 6, 2025.